UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BYRON WILLIS, | Case No. 1:21-cv-01077-CDB |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | (Doc. 54) |
| CITY OF BAKERSFIELD, et al., | **ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE *NUNC PRO TUNC* TO FILE UNTIMELY OPPOSITION BRIEF** |
| Defendants. | (Doc. 63) |
| | **ORDER GRANTING IN PART PLAINTIFF'S REQUEST TO SEAL DOCUMENTS** |
| | (Doc. 62) |

This is a civil rights lawsuit by Plaintiff Byron Willis ("Plaintiff" or "Willis") against Defendants the City of Bakersfield ("the City") and Detective Santos Luevano ("Luevano") that arises from Plaintiff's arrest by law enforcement officers.  Defendants removed this case from Kern County Superior Court on July 12, 2021.  (Doc. 1).  Following the Court's order on Defendants' motion to dismiss (Doc. 10), Plaintiff filed the operative Second Amended Complaint ("SAC") on July 18, 2022.  (Doc. 37).  Thereafter, on August 9, 2023, Defendants filed a joint motion for summary judgment now before the Court.  (Doc. 54).  Plaintiff filed an

1   untimely opposition on September 6, 2023, (Doc. 61) and Defendants filed a reply on September

2   20, 2023.  (Doc. 67).  The parties have consented to the jurisdiction of a United States Magistrate

3   Judge for all proceedings, including trial and entry of judgment, pursuant to 28 U.S.C. §

4   636(c)(1).  (Doc. 47).  For the reasons set forth below, Defendants' motion for summary

5   judgment will be granted.

6   **I.      Background**

7           On December 3, 2019, at around 11:10 a.m. to 11:19 a.m., an unidentified male physically

8   attacked a woman ("M.M.") in an apartment complex located at 5413 Ming Avenue, Bakersfield.

9   (Doc. 61-5, Plaintiff's Statement of Disputed and Undisputed Facts ("PSDUF") ⁋1).  M.M. told a

10  police officer that her attacker had a distinct foul odor and bloodshot eyes. *Id.* ⁋2. She described

11  her attacker as a black male between the ages of 25 and 30 with a dark complexion.  *Id*. ⁋3.

12  According to M.M., the attacker's height was around 5'4'' to 5'6'', his weight around 150 to 160

13  pounds, and he had a slim build. *Id*. The attacker wore a black hooded zippered sweatshirt, dark

14  gray socks, shorts, and was a possible transient. *Id*.

15          M.M. was transported to the Bakersfield Police Department ("BPD"). Detective Luevano

16  directed Lisa Wedeking-White[1] to assist M.M. with the completion of a composite sketch of her

17  attacker.  *Id*. ⁋4.  M.M. confirmed with the police that the composite sketch looked like the man

18  that attacked her.  (Doc. 56 ⁋4).[2]  She attested after the fact that her confirmation was made

19  without any influence or suggestion by anyone.  *Id*.  Once M.M. approved the composite sketch,

20  it was released to the media for the purpose of seeking assistance in identifying the suspect

21

22

23  ――――――――――――

[1] Defendant Wedeking-White was dismissed from this action and was not named as a defendant afterwards in Plaintiff's operative complaint.  *See* (Doc. 19).

24

25  [2] Plaintiff disputes this fact on the grounds that M.M.'s confirmation was not memorialized contemporaneously in a police record (Doc. 61-5 ⁋4) although it is indisputable that Detective

26  Luevano's probable cause affidavit of December 4, 2019, documented that M.M. "assisted in a composite sketch of the suspect which was released to the media."  (Doc 61-3 p. 58 [Ex. 6]).

27  Plaintiff raises similar objections to Defendants' identification of other undisputed facts based on a lack of contemporaneous documentation.  *E.g.,* (Doc. 61-5 ⁋5).  Unless specifically referenced

28  herein, the Court finds the lack of contemporaneous documentation standing alone does not create a dispute of fact where that fact otherwise is not disputed.

1   responsible for the attempted rape.  (Doc. 54-5 p. 10; Doc 61-3 p. 53 [Ex. 1] & p. 58 [Ex. 6]).[3]

2       On December 4, 2019, at approximately 6:00 a.m., Detective Luevano received

3   information from Melanie Formhals ("Formhals").  Formhals told Detective Luevano that she had

4   seen the press release and that she believed the subject depicted in that sketch to be Byron Willis.

5   (Doc. 54-5 p. 12).  Formhals explained that she is the apartment complex manager of the Mirage

6   Apartments and that Willis, who used to reside there, along with his father, would sexually harass

7   other female tenants in the complex before Willis was removed from the complex in or about

8   2018.  *Id.* at 12, 55-56.  Formhals told Detective Luevano that when she saw the composite sketch

9   on the news, she immediately believed that the composite sketch resembled Willis.  *Id.*[4]

10      At around noon on the same day, Detective Luevano received a call from Kristen Rinehart

11  ("Rinehart").  *Id.* at 61-62.  Rinehart told Luevano that she thought the composite sketch she saw

12  on the news strongly resembled Willis, who frequented the Mirage Apartments in 2018.  *Id.*

13  According to Rinehart, about one year prior, her 14-year-old daughter came home crying because

14  a man asked her for sex. The man reportedly told Rinehart's daughter that he would be gentle

15  with her because she was a virgin.  *Id.*  Rinehart and her daughter walked outside, and Rinehart's

16  daughter pointed at Willis as the person who sexually harassed her. According to Rinehart, Willis

17  admitted to sexually harassing her daughter, but he thought that she was nineteen years old.  *Id.* at

18  62.  Rinehart warned Willis that if he ever sexually harassed her daughter again, she would "cut

19  off his balls." *Id.*

20      On December 4, 2019, M.M. met with Bakersfield police officers again and was shown a

21  six-pack photographic lineup which included a photograph of Willis that Willis estimates had

22  been taken anywhere between three months and three years earlier. (Doc. 54-5 p. 13-14; Doc. 56

23  ⁋5; Doc. 61-2 ⁋8).  M.M. pointed to Plaintiff's picture among the six-pack and stated that she was

24

25  ─────────────────────

26  [3] The Court uses herein pagination assigned in a filing's CM/ECF banner.

27  [4] The Court notes that Formhals' report to the police that she believed the subject depicted in the
    sketch to be Willis was made the day after the incident; her attestation that she "immediately"

28  believed the subject was Willis is offered in a declaration dated February 23, 2023, filed in
    support of Defendants' motion for summary judgment.

"not sure" but selected the picture "because of the eyes." (Doc. 56 ⁋5).[5]  After signing the form, M.M. was asked to circle her selection and place her initials next to the circle.  Detective Luevano believed that he had probable cause to arrest Willis after his interview of Formhals and after M.M. identified Willis from the photo array as her attacker.  (Doc. 61-3 pp. 21-22).

After M.M. selected Willis' photo from the array, Detective Luevano authorized issuance of an updated press release identifying the suspect as Byron Willis and requesting information concerning Willis' whereabouts.  (Doc. 61-3 p. 40; Exhibit A, attached hereto).  The updated press release listed Willis' height as 5 feet 9 inches, and his weight as 203 pounds, which was information Detective Luevano obtained from Willis' arrest record.  (Doc. 61-3 p. 57; Exhibit A, attached hereto).  The updated press release included the original press release from the day prior, which listed the suspect's height as between 5 feet 4 inches and 5 feet 6 inches, and his weight as between 150 and 160 pounds.  *Id.*

On December 4, 2019, at around 7:15 p.m., BPD officers located Willis at 1901 S. Real Road where he was arrested for attempted rape with force and false imprisonment.  (Doc. 61-3 p. 27).  Willis was escorted to the special victims unit interview room at around 8:30 p.m.  *Id.* According to Detective Luevano, Willis exhibited an extremely foul body odor, and the whites of his eyes were extremely bloodshot, which was consistent with M.M.'s description of her assailant. (Doc. 54-5 p. 18).

Willis denied attacking M.M. or attempting to sexually assault her.  ("Declaration of Byron Deon Willis" Doc. 61-2 ⁋14).  Willis also insisted that BPD check his cell phone's Google tracking information, which he said would show where he was on the day of the attempted rape. *Id.* ⁋19.  Willis told Detective Luevano that on the day of the attempted rape he was in Delano and that his Google account tracking information would corroborate his statement.  *Id.* ⁋⁋18-19. Willis agreed to have BPD download the contents of his Google account tracking information to show his whereabouts at the time of the attempted rape.  *Id.* ⁋19. Willis also consented to giving a DNA sample.  *Id.* ⁋17.  Detective Luevano asked Willis if he would consent to a lie detector test,

---

[5] Based on an audio recording of law enforcement officers' meeting with M.M., M.M. spent approximately 30 seconds reviewing the photo array before identifying photograph #2 (Willis). (Doc. 61-1 ⁋5 & Exs. 4 and 5).

1    and Willis emphatically agreed.  Willis was confident that there would be no fingerprints or traces

2    of his DNA inside the residence where the victim reportedly was attacked.  *Id.* ¶ 17-19.

3          During the interview, Willis told Detective Luevano that although he did not remember

4    specific details, his cell phone tracking data would show where he was because he carried his

5    phone with him at all times. *Id.* Willis stated that on the day of the attempted rape, he left from

6    701 Planz Road with his girlfriend Moenisha Hill ("Hill") between 8:30 a.m. and 9:30 a.m. in

7    Hill's white Kia.  Willis first drove to the residence of an acquaintance named "Angel," and about

8    five minutes afterwards, to a gas station at 415 Roberts Lane to meet with another friend for about

9    five minutes.  (Exhibit B, attached hereto).  Afterwards, Willis drove. Willis then drove to Delano

10   sometime between 10:30 a.m. and 11:00 a.m. to meet with Hill's family.  *Id*.  After visiting Hill's

11   family, Willis and Hill went to eat at "Mi Nayarit Restaurant" in Delano, where they remained

12   until 1:30 p.m. Willis returned to Kendrick Elementary School in Bakersfield at around 2:40 p.m.

13   to pick up Hill's daughter.  *Id*.

14         During the interview, Detective Keith Schlecht, who has training and experience in

15   cellphone forensics, examined Willis' Google account tracking history and noticed that Willis'

16   tracking history had a gap of missing time coinciding with the time of the attempted rape, which

17   in turn suggested that Willis' Google account tracking history may have been manipulated to

18   create an alibi.  *Id.*

19         Detective Luevano submitted an affidavit of probable cause on December 4, 2019, at

20   11:50 p.m. (Doc. 54-5 p. 71; Doc. 61-3 p. 58 [Ex. 6]).  The affidavit states that the offense date

21   was December 3, 2019, at 11:19 a.m. and the arrest date/time was December 4, 2019, at 7:25 p.m.

22   The narrative portion of the probable cause affidavit sets forth as follows:

23              On 12/03/19 at about 1116 hours, the victim entered a vacant
              apartment when WILLIS grabbed the victim from behind and groped
24            her breast over her clothing. The victim attempted to escape out the
              apartment; however, WILLIS grabbed her, preventing her escape.
25            WILLIS placed both hands around the victim's neck choking her
              then again attempted to remove her pants as the victim stated "Stop!
26            Stop!" The victim kicked WILLIS in the groin which allowed her to
              escape his grasp then she ran towards the front door. WILLIS then
27            ran out the front door and fled the area on foot. The victim assisted
              in a composite sketch of the suspect which was released to the media.
28            Two citizens contacted the Bakersfield Police Department indicating

1
2
3
4

> that WILLIS matched the description of the composite sketch of the suspect. The victim identified WILLIS as the suspect in a photo line-up as the suspect who attempted to rape her and who held her against her will, preventing her from escaping. Probable cause to arrest WILLIS was authorized and he was arrested and booked into the Kern County Jail for the listed charges.

5   *Id*.  Plaintiff was charged with attempted rape and false imprisonment.  *Id*. at 72.  The probable

6   cause affidavit was approved by a judge on December 5, 2019, at 6:01 a.m.  *Id*. at 71.

7         Detective Schlecht authored two reports that detailed BPD's efforts to investigate

8   Plaintiff's alibi.  (Exhibit C, filed under seal).  According to the reports, Willis had a "missing

9   activity" period from his cell phone from 10:56 a.m. to 12:08 p.m. on December 3, 2019, which

10   corresponded with the time that M.M. was attacked.  *Id*.  Detective Schlecht knew that Willis'

11   alibi was that he was driving with Hill in a white 2015 Kia Optima around Bakersfield and

12   Delano during the time of the attack. Detective Schlecht visited various areas listed in the location

13   activity to see if they corroborated with the alibi.

14         On December 6, 2019, Schlecht visited "Culichi: Suchi & Mariscos" at 3017 Wilson Road

15   in Bakersfield and was provided with access to that establishment's video surveillance system by

16   an employee. The cameras indicated that around 2:15 p.m. a white Kia Optima travelled into the

17   parking lot and came to a stop.  *Id*.  A female approached and entered the vehicle.  Detective

18   Schlecht determined that the path traveled by the vehicle was identical to the path indicated by

19   the location history of Willis' cell phone.  *Id*.  Detective Schlecht also documented two other

20   instances where a white Kia Optima arrived at certain locations in a manner consistent with

21   Willis' phone information at around 10:55 a.m. and 11:37 a.m.  *Id*.  Detective Schlecht identified

22   one of these instances on December 6 and the other one on December 9, 2019.  *Id.*

23         Detective Schlecht also received other data from Byron Willis' cellphone download. *Id.*

24   In April 2020, he reviewed one year of location data from Willis' Gmail account which showed

25   that Willis never visited the scene of the crime.  The report stated that there was some initial

26   concern that Willis may have altered his Google location data search, but both his cellphone

27   downloads and Google files showed no evidence of internet searching regarding how to alter the

28   location data or other evidence that Willis accessed his Google account to make any alterations.

*Id.* Detective Schlecht also located numerous calls, chats, and SMS messages which indicated that Willis was in possession of his phone and active on the phone at the time of the offense. *Id.* The phone data corroborated Willis' alibi that he set up a meeting with Angel via Facebook messages and calls.

On January 22, 2020, BPD conducted a DNA test of a black hooded jacket that Willis was suspected of wearing at the time of the attempted rape. The analysis used DNA samples from M.M. and Willis. (Exhibit D, filed under seal). The DNA analysis excluded both M.M. and Willis as potential contributors to the DNA profile obtained from the jacket. *Id.* On January 30, 2020, Willis was released from custody. (Doc. 37 ⁋36; Doc. 61-4 p. 25). On July 29, 2020, the Kern County District Attorney's Office dismissed the charges filed against Willis. (Doc. 61-4 p. 25).

Willis was in custody during the Christmas and New Years holidays. (Doc. 37 ⁋36). While Willis was in custody, his father died, and he was unable to say his final goodbyes or mourn his father's loss with his family. (Doc. 61 p. 12).

In the operative Second Amended Complaint ("SAC"), Willis brings the following causes of action: (1) False Arrest under 42 U.S.C. §1983 against both Defendants; (2) Malicious Prosecution under 42 U.S.C. §1983 against both Defendants; and (3) False Arrest/False Imprisonment under state law against both Defendants. (Doc. 37).

**II. Applicable Law**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

Each party's position must be supported by: (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute

1  or that the opposing party cannot produce admissible evidence to support the fact.  *See* Fed. R.

2  Civ. P. 56(c)(1).  The court may consider other materials in the record not cited to by the parties,

3  but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified*

4  *School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary judgment, "the court has

5  discretion in appropriate circumstances to consider other materials, [but] it need not do so").

6  Furthermore, "[a]t summary judgment, a party does not necessarily have to produce evidence in a

7  form that would be admissible at trial." *Nevada Dep't of Corr v. Greene*, 648 F.3d 1014, 1019

8  (9th Cir. 2011) (citations and internal quotations omitted).  The focus is on the admissibility of

9  the evidence's contents rather than its form. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374

10  F.3d 840, 846 (9th Cir. 2004).

11       "The moving party initially bears the burden of proving the absence of a genuine issue of

12  material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

13  *Corp. v. Catrett,* 477 U.S. at 317, 323 (1986)).  To meet its burden, "the moving party must either

14  produce evidence negating an essential element of the nonmoving party's claim or defense or

15  show that the nonmoving party does not have enough evidence of an essential element to carry its

16  ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,

17  210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets this initial burden, the burden

18  then shifts to the non-moving party "to designate specific facts demonstrating the existence of

19  genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,*

20  477 U.S. at 323).  The non-moving party must "show more than the mere existence of a scintilla

21  of evidence." *Id.* (citing *Anderson,* 477 U.S. at 252).  However, the non-moving party is not

22  required to establish a material issue of fact conclusively in its favor; it is sufficient that "the

23  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

24  versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809

25  F.2d 626, 630 (9th Cir. 1987).

26       The court must apply standards consistent with Rule 56 to determine whether the moving

27  party has demonstrated the absence of any genuine issue of material fact and that judgment is

28  appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

1  "[A] court ruling on a motion for summary judgment may not engage in credibility

2  determinations or the weighing of evidence."  *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir.

3  2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the

4  nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.

5  *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*,

6  198 F.3d 1130, 1134 (9th Cir. 2000).

7  **III.    Discussion**

8  **1. Preliminary Matters**

9        **A.    Plaintiff's Motion to Permit Belated Filing of Opposition (Doc. 63)**

10        Because Defendants' motion for summary judgment was filed on August 9, 2023, Plaintiff

11  was required to file his opposition or statement of non-opposition no later than August 23, 2023.

12  *See* Local Rule 230(c).  On August 29, 2023, after Plaintiff had failed to timely file any

13  opposition, Defendants filed a document titled, "Notice of Plaintiff's Failure to Oppose

14  Defendant's Motion for Summary Judgment or in the Alternative, Partial Summary Judgment."

15  (Doc. 59).  Although the purpose of Defendants' filing is unclear, the notice quoted the 14-day

16  opposition filing requirement under Local Rule 230(c) and advised the Court of its prerogative to

17  construe Plaintiff's failure to oppose the motion as a non-opposition.

18        One week later, on September 5, 2023, in light of Plaintiff's failure to oppose the motion,

19  the Court entered a minute order vacating the motion hearing and deeming Defendants' motion

20  for summary judgment submitted.  (Doc. 60).  The following day, Plaintiff filed an untimely

21  opposition brief (Doc. 60) and a request to seal certain documents submitted in connection with

22  the opposition (Doc. 61).  Two days thereafter (September 8, 2023), Plaintiff filed a belated

23  motion seeking leave *nunc pro tunc* to file his untimely opposition brief.  (Doc. 63).  On

24  September 11, 2023, Defendants filed an opposition to Plaintiff's request, and that same day,

25  Plaintiff filed a reply.  (Docs. 64, 65).

26        Briefly, counsel for Plaintiff attests that he mistakenly calendared the deadline to file his

27  opposition to Defendants' motion to be 14 days prior to the date of the noticed motion hearing

28  instead of 14 days following the filing of the motion.  In other words, whereas the deadline to file

an opposition was August 23, counsel for Plaintiff thought it was September 6.  Counsel explains that, when this action was commenced, the operative local rule then in effect permitted a party to file an opposition no later than 14 days before the motion hearing – as compared to the current version of Local Rule 230(c), made effective in March 2022, that sets the deadline to be 14 days following filing of the motion.  Counsel further attests that he began working on Plaintiff's opposition brief on August 29 and discovered his misapprehension regarding the filing deadline. He attests he sought from Defendants a stipulated extension of time to file, and shortly after Defendants refused, they made their filing giving notice of Plaintiff's delinquency.  Counsel appears to blame his neglect in part on his assertion he has no record of receiving notice of the amendment to Local Rule 230.  (Doc. 63-2, Declaration of Ashton Watkins, ¶ 11).

Plaintiff cites an opinion from a district judge of this Court finding a party's neglect was excusable in filing a brief eight days late based on a similar misapprehension of the filing deadline under Local Rule 230(c).  (Doc. 63-1 p. 6) (citing *Rodriguez v. USF Reddaway Inc*., No. 2:22-cv-00210-TLN-DB, 2022 WL 18012519, at *1 n.1 (E.D. Cal. Dec. 30, 2022)).  However, as Defendants note (Doc. 64 pp. 3-4), the circumstances here are distinct in two respects.  First, the *Rodriguez* court found excusable neglect largely because the delinquent party's belated filing was just weeks after the amendment to Local Rule 230(c) – whereas here, Plaintiff's late filing was made approximately 18 months after the current version of Local Rule 230(c) came into effect. Second, notwithstanding his discovery on August 29 that he had mis-calendared the filing deadline, counsel for Plaintiff did not seek relief from Court until approximately ten days later, and not until days after the Court took the motion under submission and after Plaintiff already filed his belated opposition.

Plaintiff's suggestion that his neglect in timely filing an opposition is excusable at least in part because he did not have notice of any change of the Local Rules is not well taken.  The scheduling order in this case – which entered approximately six months after Local Rule 230 was amended – provides in relevant part:

> All counsel are expected to familiarize themselves with … the Local Rules of Practice of the Eastern District of California, <u>and to keep abreast of any amendments thereto</u>. The Court must insist upon compliance with these Rules if it

1       is to efficiently handle its increasing case load, and sanctions will be imposed for
2       failure to follow both the Federal Rules of Civil Procedure and the Local Rules of
        Practice for the Eastern District of California.

3    (Doc. 41 at 6) (emphasis added).  The mere fact that counsel for Plaintiff does not recollect

4    whether he received notice of the rule changes does not absolve him of his Court-imposed duty to

5    become familiar with and stay abreast of changes to the Local Rules.

6           Nonetheless, the undersigned finds it lamentable that Defendants opposed Plaintiff's

7    request and were unwilling to extend a professional courtesy to opposing counsel, and instead,

8    after receiving counsel's request for relief, chose to file the curious "Notice of Plaintiff's Failure

9    to Oppose" and advisal to the Court that it could construe Plaintiff's failure to oppose as a non-

10   opposition to their motion for summary judgment.  This is particularly so given Defendants'

11   acknowledgement that, in weighing Plaintiff's request, the Court is to consider the existence of

12   good faith and/or prejudice to the nonmovant, as well as the length and reason for the delay, yet

13   they have identified no real reason not to grant the relief requested except to argue that counsel

14   for Plaintiff should have been less careless and more attentive to the Local Rules.  Defendants

15   have not identified any prejudice they would suffer were the brief extension granted and they

16   have not identified any basis to conclude that counsel for Plaintiff's error was anything more than

17   a good faith mistake.

18          The Court acknowledges that it is "permitted, where appropriate," to accept filings when a

19   party missed a deadline due to carelessness.  *Pioneer Inv. Srvcs. Co. v. Brunswick Assoc. Ltd.*

20   *P'ship*, 507 U.S. 380, 388 (1993).  Having considered the factors under *Pioneer*, the Court

21   exercises its discretion to accept Plaintiff's untimely opposition.

22          **B.      Plaintiff's Motion to File Documents Under Seal (Doc. 62)**

23          In support of his opposition, Plaintiff asks the Court to file under seal a 170-page

24   document he describes as "the Bakersfield Police Department case file in the underlying sexual

25   assault investigation (Case Number 19-254948) (Case File)."  (Doc. 62, "Request to Seal").  The

26   document was emailed by counsel for Plaintiff to chambers of the undersigned consistent with

27   Local Rule 141 and is referenced in counsel's declaration (*see* Doc. 61-1 ¶ 2 & Ex. 1).  The bases

28   advanced by Plaintiff in support of the request to seal is that sealing will (1) protect the privacy

                                                    11

1  interests of witnesses who are named throughout the documents sought to be sealed, and (2)

2  protect victim M.M. – whose name also appears in the documents sought to be sealed – from

3  intimidation and possible physical and mental harm.  *Id.* at 2.

4        As previously conveyed to the parties in its order denying without prejudice Defendants'

5  earlier request to seal documents in connection with their motion for summary judgment (*see*

6  Doc. 55), the Court agrees that the interests Plaintiff seeks to protect through the requested

7  sealing of documents are important.  However, under the First Amendment, the press and the

8  public have a presumed right of access to court proceedings and documents.  *See generally Press-*

9  *Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1985); *Center for Auto Safety v. Chrysler*

10 *Group, LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016); *cf. Olympic Ref. Co. v. Carter*, 332 F.2d 260,

11 264 (9th Cir. 1964) ("In the federal judicial system trial and pretrial proceedings are ordinarily to

12 be conducted in public.").  As a general rule, the public is permitted 'access to litigation

13 documents and information produced during discovery.'"  *In re Roman Catholic Archbishop of*

14 *Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Phillips v. Gen. Motors Corp.*,

15 307 F. 3d 1206, 1210 (9th Cir. 2002) and citing *San Jose Mercury News, Inc. v. U.S. Dist. Court*,

16 187 F.3d 1096, 1103 (9th Cir. 1999)).  This presumed right can be overcome if (1) closure serves

17 a compelling interest; (2) there is a substantial probability that, in the absence of closure, this

18 compelling interest would be harmed; and (3) there are no alternatives to closure that would

19 adequately protect the compelling interest.  *Oregonian Publishing Co. v. U.S. District Court for*

20 *the District of Oregon*, 920 F.2d 1462, 1466 (9th Cir. 1990) (citing *Press Enterprise*, 464 U.S. at

21 510).

22        Importantly, many if not most of the pages of the exhibit Plaintiff seeks to file under seal

23 do not identify witnesses.  Thus, for instance, one of the documents Plaintiff seeks to file under

24 seal is a BPD press release – the Court cannot fathom what possible privacy interest is served by

25 filing under seal a document that previously was widely released to the public.  Separately,

26 Plaintiff has not articulated in his request to seal whether, under *Oregonian Publishing Co*., any

27 alternatives to complete closure would sufficiently protect the asserted compelling interests –

28 such as, for instance, redacting the names of the victim and witnesses.  *See, e.g., United States v.*

1   *Rivas Gomez*, No. 1:18-cr-0002-JLT-SKO, 2022 WL 1556659, at *2 (E.D. Cal. May 17, 2022)

2   ("[counsel] must look through the exhibits he proposes to be sealed and point out to the Court

3   why the entire document must be sealed with citations to specific legal authority supporting that

4   claim, or he must explain why redaction cannot occur such to obviate the need to seal the entire

5   document."); *Doe v. Univ. Accounting Srv., LLC*, No. 09-CV-01563-BAS-JLB, 2022 WL

6   623913, at *3 (S.D. Cal. Mar. 3, 2022) ("despite the possible threats of violence against his

7   person from his involvement in a crime as an eyewitness, Plaintiff has not adequately tailored his

8   request to seal the entire record with his need to avoid threats to his safety.").  Finally, the Court

9   notes that Plaintiff does not in his opposition to the motion for summary judgment rely upon

10  many of the documents sought to be sealed in the case file, and, thus, it is unclear to the Court

11  why such documents should be filed in the first place.

12       Notwithstanding its aversion to scouring the entire 170-page exhibit sought to be sealed to

13  determine whether any records therein warrant sealing, the Court has identified two relevant

14  reports within the exhibit that implicate privacy interests along the lines of those identified in

15  Plaintiff's request to seal.  Accordingly, the Court will grant in part Plaintiff's request to seal and

16  order the following two records be filed under seal: (1) a law enforcement report by Detective

17  Schlecht in which he memorializes his investigation of Plaintiff's alibi (Exhibit C, COB 0092-

18  0094); and (2) a report of DNA analysis (Exhibit D, COB 104-08).  The Court otherwise will

19  deny Plaintiff's request to seal any other documents within the exhibit and will file unsealed

20  concurrent with this order two documents contained in the 170-page case file and which are

21  material to the Court's ruling herein but for which Plaintiff has failed to demonstrate a basis for

22  sealing.  *See* Exhibits A & B, attached hereto.

23  **2.  Claims under 42 U.S.C. § 1983**

24       To prevail under 42 U.S.C. § 1983, a plaintiff must prove (1) that he or she was "deprived

25  of a right secured by the Constitution or laws of the United States," and (2) "that the alleged

26  deprivation was committed under color of state law."  *Marsh v. Cnty. of San Diego*, 680 F.3d

27  1148, 1152 (9th Cir. 2012) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50

28  (1999)).

1      Here, Plaintiff asserts § 1983 causes of action for false arrest and malicious prosecution

2 against both Detective Luevano and the City.  (Doc. 37 pp. 12-18).  Plaintiff acknowledges in his

3 opposition brief that the City may be liable under § 1983 "only if the city has adopted an illegal or

4 unconstitutional policy or custom."  (Doc. 61 pp. 34-35) (citing *inter alia Monell v. Dep't of Soc.*

5 *Servs.*, 436 U.S. 658 (1978)).  It is undisputed that the conduct at issues arises under color of state

6 law.  Thus, the key issue is whether Defendants deprived Plaintiff of constitutional rights.

7      "The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

8 houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. Amend.

9 IV.  An arrest pursuant to a valid warrant is ordinarily consistent with the Fourth Amendment.

10 *Baker v. McCollan*, 443 U.S. 137, 143 (1979).  Among other things, law enforcement officers

11 who execute an arrest warrant are generally not required under the Constitution to investigate

12 independently every assertion of innocence based on a claim of mistaken identity, nor are officers

13 who maintain custody of an accused constitutionally required to perform error-free investigations

14 of claims of mistaken identity.  *Id.* at 145-46.

15      Conversely, an arrest without probable cause violates the Fourth Amendment and gives

16 rise to a claim for damages under § 1983.  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022

17 (9th Cir. 2008); *see Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 n.1. (9th Cir. 2015)

18 (absence of probable cause is an essential element of § 1983 false arrest and malicious

19 prosecution claims).  Probable cause is measured by an objective standard based on the

20 information known to the arresting officer.  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir.

21 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  *See Hill v. Scott*, 349 F.3d 1068, 1072 (8th

22 Cir. 2003) ("[S]ufficent probability, not certainty, is the touchstone of reasonableness under the

23 Fourth Amendment…").  To determine whether an officer had probable cause for an arrest, courts

24 "examine the events leading up to the arrest, and then decide whether these historical facts,

25 viewed from the standpoint of an objectively reasonable police officer, amount to probable

26 cause."  *O'Doan v. Sanford*, 991 F.3d 1027, 1039 (9th Cir. 2021) (quoting *D.C. v. Wesby*, 583

27 U.S. 48, 56-57 (2018) (internal citations and quotation omitted)).

28      To prevail on a claim for false arrest under § 1983, a plaintiff must "demonstrate that there

was no probable cause to arrest him." *Norse v. City of Santa Clara*, 629 F.3d 966, 978 (9th Cir. 2010) (quoting *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998)). Typically, "[w]here the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury." *Harper*, 533 F.3d at 1022.

Here, Plaintiff argues that Detective Luevano, who signed an affidavit in support of the warrant for his arrest, deliberately omitted or misrepresented important information to mislead the approving magistrate judge (Doc. 61 pp. 25-26, 31) – a "judicial deception" theory of liability. *See Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011).  To prevail on such a claim, Plaintiff "must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *Ewing v. City of Stockton*, 588 F.3d 1218, 1223-24 (9th Cir. 2009) (quoting *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir.2004)).

While the affiant officer "need not include *all* the information" known to him in the supporting affidavit, the omission of facts that "cast doubt on the existence of probable cause" makes those omissions material. *United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1991) (emphasis in original). *But cf. United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) ("An officer presenting a search warrant application has a duty to provide, in good faith, all relevant information to the magistrate.").  If the plaintiff bringing a claim under a judicial deception theory can make a "substantial showing" of "deliberate falsehood or reckless disregard for the truth," and "but for" the misstatement or omission, probable cause would have been lacking, then "the matter should go to trial." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (quoting *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995)).

A false statement or omission is material if "the affidavit, once corrected and supplemented, would not have provided a magistrate judge with a substantial basis for finding probable cause." *Chism v. Washington State*, 661 F.3d 380, 389 (9th Cir. 2011) (internal quotation and citation omitted).

Plaintiff argues the judicial finding of probable cause to issue a warrant for his arrest is undermined here because Detective Luevano engaged in deception by omitting information in his probable cause affidavit, specifically: (1) the significant difference in height and weight between

15

1    Plaintiff and the victim's description of the suspect; (2) the fact that police detained another

2    person near the crime scene shortly after the attempted rape who matched the description of the

3    actual perpetrator; (3) the fact that the two citizens who identified Plaintiff as a person who

4    resembled the composite sketch of the suspect disliked Plaintiff, spoke with each other before

5    reporting to law enforcement, and made false allegations about Plaintiff; (4) the fact that

6    Plaintiff's DMV photo was not used in the lineup; and (5) the fact that Detective Luevano failed

7    to analyze Plaintiff's Google GPS information, which revealed information corroborative of his

8    alibi.  (Doc. 61 pp. 26-27).

9            The Court examines below each of these categories of information and concludes that,

10   although much of the information is relevant and its inclusion in the warrant affidavit would have

11   given the issuing magistrate judge important context in assessing the existence of probable cause,

12   the omission of this information collectively does not vitiate the existence of probable cause to

13   issue the arrest warrant.

14                         **(I) Height and Weight**

15           In the context of arrest warrants, the Ninth Circuit has recognized that height and weight

16   discrepancies can affect probable cause to arrest.  *See Garcia v. Cnty. of Riverside*, 817 F.3d 635,

17   640-42 (9th Cir. 2016) (citing cases).  Generally, courts consider height differences of five inches

18   or less to be insufficient to undermine probable cause.  *Willis v. City of Bakersfield*, No. 1:21-cv-

19   01077-AWI-JLT, 2022 WL 2306907, at *6 (E.D. Cal. Jun. 7, 2022); *see Rodriguez v. Farrell*,

20   280 F.3d 1341, 1348 (11th Cir. 200) ("[A] mistaken estimate of no more than five inches does not

21   equal a constitutional violation."); *White v. Olig*, 56 F.3d 817, 818-20 (7th Cir. 1995) (holding

22   that a height difference of five inches and race confusion did not invalidate the arrest); *cf. Garcia*,

23   817 F.3d at 641 (explaining that further investigation was warranted because the arrestee was

24   "nine inches taller and forty pounds heavier than the warrant subject"); *Gant v. Cnty. of Los

25   Angeles*, 772 F.3d 608, 618 (9th Cir. 2014) (further investigation warranted because there was a

26   seven-inch height difference between the arrestee and the subject of the warrant); *Cameron v.

27   Brown*, 721 Fed. Appx. 612, 613 (9th Cir. 2017) (where plaintiff did not match the physical

28   description of the female perpetrator provided by the witness and had a height and weight

difference of six inches and 15 pounds, holding that a reasonable jury could find that a height difference of six inches for a woman is, at a minimum, a "red flag" that "should have led officers to question whether the person described" in the incident report was plaintiff).

Here, there was only a five-inch difference between M.M.'s lowest estimate of her assailant's height and Plaintiff's reported height (and only a three-inch difference based on M.M.'s high estimate of the suspect's height). Because a height difference of no more than five inches is slight, Detective Luevano's omission from his affidavit of this information does not create a disputed issue of fact capable of vitiating probable cause.

The approximate 40-pound difference between the high-end estimate M.M. assigned to the weight of her assailant and Plaintiff's weight presents a closer question. Detective Luevano testified that although he knew that Plaintiff was around 200 pounds based on his prior arrest record and appeared to be of that weight when he made contact with Plaintiff during the investigation, in Detective Luevano's experience, people might have different versions of height and weight, which places physical characteristics as just one "part of the puzzle." (Doc. 61-3 pp. 37-39). Detective Luevano testified that victims may get certain things wrong after a crime since they are too focused on the attack itself and cannot pay attention to the suspect's physical characteristics. *Id.* at 39.

Moreover, the perpetrator was wearing a black hooded zippered sweatshirt at the time of the attempted rape. *Id.* at 53. It stands to reason that the use of certain clothing like sweatshirts may render it difficult properly for a victim to ascertain someone's precise height and weight. In a "mistaken identity" case, the Ninth Circuit has found that a height difference of nine inches and weight difference of 40 pounds between an improperly arrested plaintiff and a suspect constitutes a "red flag" warranting further investigation. *Garcia*, 817 F.3d 642. But as the formerly assigned district judge in this case previously observed in ruling on Defendants' earlier motion to dismiss, weight is a less reliable identification factor than height because a person's weight can vary dramatically over time. *Willis*, 2022 WL 2306907, at *6. *Cf. Garcia*, 817 F.3d at 642 (the "extreme difference in height of nine inches between the warrant subject and Garcia, which could not be explained as a normal growth process for an adult, was a red flag, as was, *to a lesser*

*degree*, the forty pound weight differential") (emphasis added).

Accordingly, the Court finds that the five-inch (at most, and three-inch at least) and 40-pound difference at issue in this case is a far cry from the *nine inch* and 40-pound discrepancy that prompted the *Garcia* court to hold that further investigation was warranted. Given the totality of circumstances as set forth above, the Court therefore concludes this height/weight discrepancy was not material given that a supplemented version of the affidavit noting the discrepancy between M.M.'s observations and Plaintiff's actual height and weight still would have provided the magistrate judge with a substantial basis for finding probable cause to issue the arrest warrant. *Chism*, 661 F.3d at 389.

**(II) Animus**

Plaintiff argues that Detective Luevano knew that Rinehart and Formhals (the witnesses who identified Plaintiff as the suspect depicted in the composite sketch in the BPD press release) spoke to each other before they reported to law enforcement and that his omission of this fact from the probable cause affidavit constitutes judicial deception. (Doc. 61 p. 18). In addition, Plaintiff argues that Detective Luevano knew that both witnesses held grudges against Plaintiff. Moreover, Plaintiff argues that Detective Luevano knew or should have known that Formhals made a false police report against him, and that Rinehart previously threatened to "cut off [Plaintiff's] balls."

The Court acknowledges that disclosure of the fact that the two witnesses spoke to each other about Plaintiff after seeing the composite sketch and reporting to law enforcement would be important to the determination of probable cause because it would tend to undermine the existence of two *independent* sources of information. However, assuming the magistrate judge knew that Formhals and Rinehart spoke to each other and that both disliked Plaintiff, they nevertheless were able to positively identify Plaintiff as the person depicted in the composite sketch, which was corroborated by M.M.'s own identification even though M.M. did not speak to either witness, and there is no indication that one witness's confidence in her identification overbore the other witness's uncertainty. *Cf. Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997) (officer shielded by qualified immunity notwithstanding his intentional omission

1    from his warrant affidavit of information that reporting witnesses were angry at and disliked

2    suspect; reasoning, "we cannot say that a magistrate would not have issued the warrant if he had

3    been told all that [the affiant] knew about the informants.").  Further, the witnesses offered

4    Detective Luevano a reasonable basis in fact for their identification of Plaintiff given that they

5    lived for some period of time at the same apartment building.

6                            **(III) Plaintiff's DMV Photo**

7          Plaintiff argues that Detective Luevano knew he used undue influence during his photo

8    lineup with M.M.  (Doc. 61 p. 25).  For instance, Plaintiff argues that Detective Luevano

9    intentionally presented Plaintiff's booking photo to M.M., even though that photo was older and

10   looks like a wanted poster photo, instead of a more accurate photo issued by the Department of

11   Motor Vehicles ("DMV"), which was taken closer in time to the incident in question.

12         Plaintiff cites no authority for the proposition that the use of a booking photo somehow

13   taints a photo lineup or that an affiant's failure to inform a magistrate judge considering a

14   probable cause warrant application that an underlying photo lineup included booking photos

15   amounts to judicial deception.  Here, the photo lineup displays the photographs of six men against

16   a grey background and the photos depict only the men's head and neck regions. (Doc. 61-1 p. 27).

17   Plaintiff's photo in the lineup was not unduly suggestive relative to the other photos near him.

18   Second, Plaintiff's DMV photo shows his head and neck area at a similar angle but against a blue

19   background. (Doc. 61-2 p. 9).  Had Plaintiff's DMV photo been used in the lineup, Defendants

20   may have been subject to an allegation of undue suggestiveness since his picture would have been

21   the only one with a different background. Finally, the difference between Plaintiff's DMV photo

22   and the photo used in the array is immaterial given that both photos bear a resemblance to

23   Plaintiff at the time he was arrested.  *Cf.* (Doc. 61-1 p. 27; 61-2 p. 9) *with* (Doc. 61-2 pp. 11-24).

24   A lineup is unduly suggestive when "circumstances lead [] the witness to identify a particular

25   person as the perpetrator of a crime."  *Collins v. County of Alameda*, No. 22-16871, 2024 WL

26   1192265, at *3 (9th Cir. 2024) (unpublished) (quoting *Perry v. New Hampshire*, 565 U.S. 228,

27   232 (2012)).  In this case, there are no attributes of the photo lineup that implied Plaintiff was the

28   perpetrator, as his picture did not stand out in the context of the other photos in the lineup.  *Id.*

1    (finding that cropping backgrounds of all photos did not make any photo stand out and instead

2    achieved the opposite effect).

### (IV) The Detention of Another Person Near the Crime Scene

4        Plaintiff asserts that the police detained another person near the scene of the crime shortly

5    after the attempted rape who matched the description of the actual perpetrator. (Doc. 61 p. 16,

6    26).  However, Plaintiff identifies no evidence that Detective Luevano knew of this person of

7    interest or otherwise considered him in his investigation; in fact, Detective Luevano's deposition

8    testimony strongly suggests he did not know of this person when he authored his warrant

9    affidavit. (Doc. 61-3 p. 10-12).  Detective Luevano's omission of this detail, thus, cannot

10   constitute a reckless misrepresentation or omission sufficient to vitiate probable cause.

### (V) Plaintiff's Geolocation Information

12       Plaintiff argues that Detective Luevano failed to include in his warrant affidavit other

13   exculpatory evidence Plaintiff proffered shortly after his arrest.  Namely, Plaintiff argues that on

14   the day of his arrest, Plaintiff signed a consent form and allowed Defendants to search his phone,

15   which included his Google account information.  (Doc. 61 pp. 6-7).  Plaintiff argues that his

16   phone geolocation services showed that he was not near the scene of the crime on December 3,

17   2019, but that Detective Luevano nevertheless declined to include this information in his probable

18   cause affidavit.  *Id*. at 22-23.

19       Once probable cause is established, officers are under "no duty to investigate further or to

20   look for additional evidence which may exculpate the accused."  *Cameron v. Craig*, 713 F.3d

21   1012, 1019 (9th Cir. 2013). *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003). However,

22   officers cannot disregard facts that tend to dissipate probable cause.  *Nicholson v. City of Los*

23   *Angeles*, 935 F.3d 685, 691 (9th Cir. 2019); *Lopez*, 482 F.3d at 1073.  "If probable cause is

24   established at any early stage of the investigation, it may be dissipated if the investigating officer

25   later learns additional information that decreases the likelihood that the defendant has engaged, or

26   is engaging, in criminal activity." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir.

27   2005).  "A person may not be arrested, or must be released from arrest, if previously established

28   probable cause has dissipated."  *Sanford*, 991 F.3d at 1041; *Nicholson*, 935 F.3d at 691; *Ortiz-*

1    *Hernandez*, 427 F.3d at 574. However, once a prosecutor has filed charges, the arresting officers

2    will generally be found immune for the continued detention. *See Ewing*, 588 F.3d at 1232.

3         During his interview with Detective Luevano, Willis provided a timeline of his movement

4    during the day of the sexual assault. (Doc. 61-4 p. 12). In addition, Willis gave Detective Luevano

5    permission in writing to search his phone as his GPS location services would have corroborated

6    his claim that he was in Delano at the time of the crime. *Id*.  Detective Schlecht, who was

7    assisting Detective Luevano with his investigation and has experience as a computer forensic

8    examiner, examined Plaintiff's phone. (Doc. 61-4 pp. 5-6). According to Detective Schlecht's

9    deposition, while he was searching Plaintiff's phone and taking screenshots, he noticed that there

10   was a period of "missing activity" in Plaintiff's location history.  *Id*. at 14.  This missing activity

11   was for the date of December 3, 2019, from 10:56 a.m. to 12:08 p.m. *See* (Doc. 61-2 p. 26).

12   Detective Schlecht's report states that the period of missing activity coincided with the period that

13   the offense occurred.  Detective Schlecht knows from his experience with Google location history

14   that a user can edit the location data. (Exhibit C, filed under seal).  According to Detective

15   Luevano, Detective Schlecht shared his suspicions with him, and he deferred to Detective

16   Schlecht's opinion.

17        It was not until December 9, 2019 – *i.e*., four days *after* Detective Luevano authored his

18   warrant affidavit – when Detective Schlecht had been able to corroborate some aspect of

19   Plaintiff's alibi.  *See id.*  In addition, Detective Luevano testified he believed that he had probable

20   cause to arrest plaintiff after speaking to the victim and the witnesses. (Doc. 61-3 p. 24).

21   "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the

22   facts known to the arresting officer at the time of the arrest." *Nieves Martinez v. United States*,

23   997 F.3d 867, 879 (9th Cir. 2021) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Here,

24   in light of all the circumstances, Detective Luevano reasonably concluded that he maintained

25   probable cause at the time of the arrest since two witnesses identified Plaintiff as the person

26   depicted in the press release and M.M. (the victim) identified Plaintiff from a photo array as her

27   assailant. (Doc. 61-3). Had Detective Luevano added Plaintiff's alibi to the probable cause

28   affidavit, the addition likely also would have included what Detectives Luevano and Schlecht

knew at that time – which is that there was a period of missing activity roughly at the same time the assault occurred.   The affidavit also would have stated that based on Detective Schlecht's experience, people can change their Google location data.

Assuming Detective Luevano deliberately omitted this information, Plaintiff still would not have been able to establish that "but for" the dishonesty, his arrest would not have occurred. *Chism*, 661 F.3d at 386.  The magistrate judge still would have known that M.M. positively identified Plaintiff and her identification was corroborated by two witnesses.  The Google information data, as it was understood at the time, did not dissipate probable cause because it was undermined by the "missing activity" right at the time that the assault occurred. *Nieves Martinez*, 997 F.3d at 880.

*     *     *     *     *

As detailed above, although inclusion in the warrant affidavit of much of the information Plaintiff argues was deceptively omitted would have given the issuing magistrate judge important context in assessing the existence of probable cause, the Court concludes the omission of this information collectively is not material.  Specifically, the Court finds that inclusion of this information in the warrant affidavit nevertheless would have permitted a judicial finding that probable cause for Plaintiff's arrest existed.  *E.g., Ewing*, 588 F.3d at 122-25 (false information in warrant affidavit deemed not material where an independent, reliable source's description of the crime and identification of the plaintiff were sufficient to establish probable cause).

Given this conclusion, the Court must grant Defendants summary judgment on Plaintiff's false arrest and malicious prosecution causes of action brought under § 1983.  *See Yousefian*, 779 F.3d at 1014 ("The absence of probable cause is a necessary element of § 1983 false arrest and malicious prosecution claims"); *Smith*, 640 F.3d at 938 ("even after correcting for the allegedly false and omitted information in Sergeant Almada's warrant application, probable cause supported Smith's arrest for arson. For the same reason, probable cause supported Smith's prosecution."); *Carvajal v. Clark Cnty.*, 539 F. Supp.3d 1104, 1116 (D. Nev. 2021) (same).[6]

---

[6] As Plaintiff acknowledges (*see* Doc. 61 pp. 34-35), the City additionally may not be liable under § 1983 unless, in addition to establishing its involvement in the deprivation of a constitutional right, Plaintiff shows the City implemented a deliberately indifferent policy that was a moving

1   **2.      State False Arrest and False Imprisonment Claims**

2        Turning to Plaintiff's state law claims, under California law, false arrest and false

3   imprisonment are not separate torts; instead, a false arrest is considered a way to commit a false

4   imprisonment. *Watts v. Cnty. of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001).  To state a claim

5   of false arrest or false imprisonment, a plaintiff must show: "(1) the nonconsensual, intentional

6   confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time,

7   however brief." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011) (quoting

8   *Easton v. Sutter Coast Hosp.*, 80 Cal. App.4th. 485, 496 (2000)).  Similar to a claim under §

9   1983, "California state law prohibits civil liability for false arrest where an arresting officer had

10  reasonable cause to believe the arrest was lawful." *Garcia v. Cnty. of Merced*, 639 F.3d 1206,

11  1213 (9th Cir. 2011) (reversing denial of summary judgment on state law false arrest claim where

12  officer defendants had probable cause to arrest plaintiff); *see Jaramillo v. City of San Mateo*, 76

13  F.Supp.3d 905, 927 (N.D. Cal. 2014) ("Courts analyze state false arrest and false imprisonment

14  claims under the same rubric as § 1983 claims based on false arrest under the Fourth

15  Amendment.") (citations omitted).

16       Since the Court finds Plaintiff fails to identify any disputed issue of material fact as to the

17  existence of probable cause for Plaintiff's arrest under § 1983, the Court must grant summary

18  judgment to Defendants on Plaintiff's state law claims for false imprisonment and false arrest.

19

20  *Remainder of This Page Intentionally Left Blank*

21

22

23

24

---

25  force behind Plaintiff's alleged injury.  *See Mabe v. San Bernardino Cnty., Dep't of Pub. Soc.*

26  *Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citation and quotation marks omitted).  Because
    Plaintiff is unable to raise a triable issue of material fact as to the existence of probable cause and,

27  hence, existence of a constitutional injury, the Court declines to separately address Defendants'
    arguments concerning the remaining elements of a *Monell* claim.  *See Aguilera v. Baca*, 510 F.3d

28  1161, 1174 (9th Cir. 2007) (declining to reach *Monell* claim against city since no violation of any
    constitutional right occurred).

## IV.     Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED:

1.  Defendants' motion for summary judgment (Doc. 62) is GRANTED.

2.  The Clerk of the Court is directed to CLOSE this case.

IT IS SO ORDERED.

Dated:   **April 15, 2024**

_____

UNITED STATES MAGISTRATE JUDGE

24